**ISLAND CREEK COAL SALES COMPANY, Plaintiff,**

v.

**INDIANA–KENTUCKY ELECTRIC CORPORATION, Defendant.**

**No. 73 Civ. 564.**

United States District Court, S. D. New York.

Nov. 21, 1973.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City (Simon Rose, New York City, of counsel), and Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa. (James G. Park, Bruce A. Americus, Pittsburgh, Pa., of counsel), for plaintiff.

Cahill, Gordon & Reindel, New York City (Raymond L. Falls, Jr., Joel C. Balsam, New York City, of counsel), and Squire, Sanders & Dempsey, Cleveland, Ohio (John Lansdale, Jr., Robert C. Maynard, Isaac Schulz, Cleveland, Ohio, of counsel), for defendant.

## OPINION

BAUMAN, District Judge.

This is a motion by defendant Indiana-Kentucky Electric Corporation (hereinafter "IKEC") for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.[1] Because the question presented is exclusively one of contractual interpretation, I am satisfied that there is no genuine issue as to any material fact. For the reasons that follow, defendant's motion for summary judgment is granted.

Island Creek Coal Sales Company (hereinafter "Island Creek"), plaintiff herein, is engaged primarily in the business of marketing coal mined by its parent, Island Creek Coal Company. IKEC is a public utility incorporated under the laws of the State of Indiana. On December 19, 1966 the parties entered into a Coal Supply Agreement pursuant to which plaintiff was to supply coal to defendant from plaintiff's Hamilton No. 1 mine in western Kentucky. The deliveries were to commence between March 1 and September 1, 1968, and extend through December 31, 1982. Although the agreement is a highly detailed document of 43 pages, the instant controversy revolves around but two of its provisions: Article IV, § 6,[2] which concerns conditions under which either party in its "sole judgment" might terminate the agreement, and Article VI, § 12,[3] which concerns submission to arbitration.

---

1. Although it is alternatively styled a motion to dismiss pursuant to Rule 12(b)(6), both sides make reference to matters outside the pleadings and thus the motion is properly treated as one for summary judgment.

2. Article IV, § 6:
"The parties hereto recognize the possibility that, during the continuance of this Agreement, legislative or regulatory bodies or the courts may impose regulations or restrictions relating to air pollution which will make it impossible or impractical for Buyer to utilize the coal thereafter to be delivered hereunder. Such regulations or restrictions could pertain to, but would not necessarily be limited to, sulfur. If any such regulations or restrictions are imposed and if as a result thereof Buyer in its sole judgment decides that it will be impossible or impractical for Buyer to utilize the coal to be delivered hereunder, Buyer shall so advise Seller and thereupon Buyer and Seller shall promptly consider what corrective steps they can take in the mining and preparation of the coal at Seller's mine and in the handling and combustion of the coal at Buyer's plant; and if in Buyer's sole judgment such steps will not, without unreasonable expense to Buyer, make it possible for Buyer to utilize the coal thereafter to be delivered hereunder without violating such regulations or restrictions, Buyer shall have the right, upon notice to Seller, to terminate this Agreement without further obligation to Seller hereunder; provided, however, that Seller may, at its option, prevent such termination by agreeing to reimburse Buyer for such expense to the extent that Buyer, in its sole judgment, deems such expense to be unreasonable.

The parties hereto also recognize the possibility that, during the continuance of this Agreement, legislative or regulatory bodies or the courts may impose regulations or restrictions relating to mining practices which will make it impossible or impractical for Seller to continue to produce coal for delivery hereunder. Such regulations or restrictions could pertain to, but would not necessarily be limited to, air pollution, water pollution, waste disposal or surface subsidence. If any such regulations or restrictions are imposed and if as a result thereof Seller in its sole judgment decides that it will be impossible or impractical for Seller to continue to produce coal for delivery hereunder, Seller shall so advise Buyer and thereupon Seller and Buyer shall promptly consider what corrective steps they can take in the mining and preparation of the coal at Seller's mine and in the handling and combustion of the coal at Buyer's plant; and if in Seller's sole judgment such steps will not, without unreasonable expense to Seller, make it possible for Seller to continue to produce coal for delivery hereunder without violating such regulations or restrictions, Seller shall have the right, upon notice to Buyer, to terminate this Agreement without further obligation to Buyer hereunder; provided, however, that Buyer may, at its option, prevent such termination by agreeing to reimburse Seller for such expense to the extent that Seller, in its sole judgment, deems such expense to be unreasonable."

3. Article VI, § 12:
"Except as to any matter expressly stated herein to be within the sole judgment of one of the parties hereto, any dispute, controversy or claim arising out of or relating to this Agreement shall be deter-

In 1968 and 1969 deliveries of coal were made in accordance with the terms of the contract. In 1970, however, Island Creek was unable to make delivery in the quantities specified in the agreement, attributing this inability, then as now, to the passage of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 et seq., which became effective March 30, 1970.

On June 10, 1971, pursuant to Article VI, § 12, the parties executed a joint submission to arbitration, which is set forth in full in the appendix to this opinion. In it, the parties presented for resolution the following questions: 1) whether Island Creek was obligated to deliver to IKEC not less than 2,125,000 nor more than 2,500,000 tons of coal in 1971 in accordance with Article III, § 1 of the Coal Sales Agreement; 2) to what extent IKEC was damaged by Island Creek's failure to deliver 400,000 tons of coal in 1970 and 1,000,000 tons in 1971; 3) whether and to what extent the Federal Mine Health and Safety Act of 1969 relieved Island Creek of its obligations under the agreement; 4) whether Island Creek was entitled to terminate the agreement under the provisions of Article IV, § 6, or under the *force majeure* clause of Article VI, § 5, or under Article 2–615 of the Uniform Commercial Code; 5) whether the curtailment in the development of the Hamilton No. 1 mine occasioned by governmental regulations entitled Island Creek to equitable adjustment or termination of the agreement. The remedy there sought by IKEC was "Specific Performance and Damages", and that sought by Island Creek was "Termination".

Subsequently the parties agreed to consider what corrective measures could be taken by Island Creek that would enable it to comply with the recent federal legislation and yet meet its commitments under the Coal Supply Agreement. A meeting was held on December 14, 1971 at which representatives of Island Creek produced a report purporting to comply with the requirement of Article IV, § 6 that the parties consider "corrective steps" before termination. The report concluded as follows: "Island Creek has determined that such steps will not make it possible for Island Creek to continue to produce coal for delivery to IKEC without unreasonable expense to Island Creek as hereinbefore described." In the ensuing months this remained plaintiff's position and finally, on July 20, 1972, its chairman wrote to IKEC giving notice that Island Creek was invoking its right to terminate pursuant to Article IV, § 6.

When IKEC then attempted to press ahead with the arbitration Island Creek commenced the instant action, in which it seeks, in essence, a declaratory judgment that its decision to terminate the agreement was not arbitrable but was rather, in the language of Article IV, § 6, a matter within its "sole judgment". The arbitration has been held in abeyance pending the outcome of this case.

In moving for summary judgment, defendant advances two basic arguments. First, it contends that Article IV, § 6 by its terms does not leave all matters relating to termination within Island Creek's sole judgment. Specifically it argues that arbitration should determine whether the Federal Mine Health and Safety Act of 1969 comes within the definition of the "regulations or restrictions relating to mining practices" set forth in that section, and that arbitration should also determine whether Island Creek's decision to terminate resulted from such regulations. Arbitration, in other words, must determine whether the prerequisites to Island Creek's exercise of its sole judgment

mined by arbitration in accordance with the rules then obtaining of the American Arbitration Association; provided that neither party shall initiate arbitration proceedings until the expiration of thirty (30) days after notice of such dispute, controversy or claim shall have been given to the other party. Judgment upon the award rendered may be entered in any court, state or federal, having jurisdiction."

have been met. The second argument advanced by IKEC is that regardless of the construction of Article IV, § 6, Island Creek in fact submitted to arbitration on June 10, 1971 the very issue it now seeks to foreclose, namely, its right to terminate.

Island Creek in response contends that Article IV, § 6 leaves nothing for resolution by arbitration. It points out that Article VI, § 12 exempts from arbitration matters expressly stated to be within "the sole judgment" of one of the parties, and that Article IV, § 6 is the only section in the entire 43 page agreement that makes reference to "sole judgment". Secondly, it contends that although it joined in the June 10, 1971 submission, it "in no way" agreed to arbitrate matters which Article IV, § 6 held to be within its sole judgment.

Of the two questions presented, the meaning of "sole judgment" in Article IV, § 6 is by far the more difficult, but it is one which I need not resolve here. For even assuming *arguendo* that its scope is as broad as Island Creek asserts, I conclude that Island Creek submitted to arbitration its right to terminate under Article IV, § 6 and, having done so, cannot now seek to withdraw from it.

The governing legal principle was best articulated by Judge Clark in Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805 (2nd Cir. 1960), cert. denied, 363 U.S. 843, 80 S.Ct. 1612, 4 L.Ed.2d 1727 (1960). Where a disagreement exists over the scope of the arbitration agreement, and where the parties nevertheless voluntarily submit their dispute to arbitration, they "evinc[e] a subsequent agreement for private settlement which would cure any defect in the arbitration clause." The court cited Chief Judge Cardozo in Finsilver, Still & Moss, Inc. v. Goldberg, Maas & Co., 253 N.Y. 382, 171 N.E. 579 (1930): "We assume that circumstances may exist in which a party to an arbitration, joining in its proceedings without protest or disclaimer, may be found to have joined by implication in the appointment of the arbitrators, and to have confirmed their jurisdiction, if otherwise defective." The *Amicizia* holding was followed in Ficek v. Southern Pacific Company, 338 F.2d 655 (9th Cir. 1964), cert. denied, 380 U.S. 988, 85 S. Ct. 1362, 14 L.Ed.2d 280 (1965). The court, while acknowledging that "arbitration is a matter of contract", held that "an agreement to arbitrate a particular issue need not be express—it may be implied from the conduct of the parties. [Plaintiff] concedes that the precise issue which he now seeks to litigate was in fact submitted to the arbitrators. Even if the initial arbitration clause was not broad enough to include [plaintiff's] claim, by voluntarily submitting the dispute to arbitration" the parties had in effect broadened the scope of the initial agreement. See also Foster-Forbes Glass Co. v. Glass Bottle Blowers Association, 263 F.Supp. 729 (N.D.Ind.1967), holding that the parties' intention to arbitrate could be determined not only by the initial arbitration clause, but also by the text of the submission agreement.

In the instant case the submission agreement of June 10, 1971 leaves little room for interpretation. It begins with a recitation that "[t]he named parties hereby submit the following disputes to arbitration . . . ." The fourth paragraph following this preamble begins: "Island Creek also contends that it is entitled to terminate its contract with IKEC under the provisions of Article IV, § 6." I can see no other sensible interpretation of this language than as a submission to arbitration of Island Creek's right to terminate under that section. The explanation proffered by Island Creek is that "the inclusion of reference to Article IV, § 6 was intended by the plaintiff to indicate to the arbitrators that in said Agreement the defendant had been allocated the risk of governmental regulations."[4] That

4. Affidavit of James G. Park at paragraph 6.

might be charitably characterized as a *post hoc* rationalization; in any case, it finds no support in the wording or the structure of the submission agreement. Equally untenable is plaintiff's assertion that it sought termination only under the *force majeure* clause of the supply agreement and under Article 2–615 of the Uniform Commercial Code. On the contrary, Article IV, § 6 is asserted as the principal basis for termination; the reference to other alleged bases is clearly meant to supplement this argument.

Although I hold that the submission agreement in itself is sufficient to establish the parties' intention to submit the question of Island Creek's right to terminate to arbitration, there is further evidence to support this conclusion. The affidavit of Robert C. Maynard, one of IKEC's attorneys, provides valuable insight into the composition of the submission agreement. The first proposed Submission to Arbitration which he drafted and sent to Island Creek's attorneys made no reference to termination or to any claim or demand by Island Creek for termination. These were added by Island Creek's draftsmen in the amended Submission which they filed in response to IKEC's proposal and they thereafter found their way into the joint submission. In other words, the fourth and fifth paragraphs following the preamble, and the words "Remedy Sought by Island Creek: Termination" were drafted by Island Creek alone. Island Creek has submitted nothing in contradiction of the Maynard account.

The foregoing establishes that the interjection of the issue of the right to terminate under Article IV, § 6 was Island Creek's doing, concurred in by IKEC. I do not by this suggest that the submission could be subject to any other interpretation were the controverted language that of IKEC; rather, the account of the composition simply provides reassurance that Island Creek was not tricked or coerced into waiving its right, if any, to withhold the question of termination from arbitration. With the authorship of these paragraphs established, it is also not amiss to invoke the rule that a contract must be construed *contra proferentem*. Having sought the inclusion of this language, Island Creek cannot now disavow it.

I therefore conclude that Island Creek agreed to submit to arbitration the question of its right to terminate under Article IV, § 6. Accordingly, IKEC's motion for summary judgment dismissing the action must be granted.

It is so ordered.

## APPENDIX

### "AMERICAN ARBITRATION ASSOCIATION SUBMISSION TO ARBITRATION

Dated: June 10, 1971

The named Parties hereby submit the following disputes to arbitration under the Commercial Arbitration Rules of the American Arbitration Association:

Indiana-Kentucky Electric Corporation (hereinafter referred to as IKEC) claims that Island Creek Coal Sales Company and Island Creek Coal Company (hereinafter collectively referred to as Island Creek) should be required to deliver not less than 2,125,000 nor more than 2,500,000 tons of coal to IKEC during the year 1971 in accordance with a written contract and guarantee dated December 19, 1966, copies of which are attached hereto and marked collectively as Exhibit A.

In addition, IKEC claims damages in an amount which cannot presently be determined for Island Creek's failure to deliver approximately 400,000 tons of coal under the provisions of said contract and guarantee

during the year 1970, and approximately 1,000,000 tons of coal during the year 1971.

Island Creek denies that it was or is obligated to produce and deliver to IKEC the aforementioned quantity of coal to IKEC. It contends that the Federal Mine Health and Safety Act of 1969 has made it impossible or impractical for Island Creek to produce at its Hamilton No. 1 Mine and deliver to IKEC the total quantity of coal stated in the contract for the years 1970 and 1971 and that it has been forced to prorate its production from that mine among its long-term contract customers of that mine.

Island Creek also contends that it is entitled to terminate its contract with IKEC under the provisions of Article IV, Section 6. To the extent that termination under Article IV, Section 6 is not available from the first day on account of which IKEC claims damages, Island Creek asserts its right to be excused from performance under the force majeure clause of the contract and under Article 2–615 of the Uniform Commercial Code.

Further, Island Creek asserts that a hardship has occurred whereby Island Creek is prevented from developing the Hamilton No. 1 Mine as planned because of matters beyond its control, namely, government regulations and legislative action, that IKEC has refused to recognize the same, and that therefore the contract should either be equitably adjusted by amendment or terminated.

| | |
|---|---|
| Remedy Sought by IKEC: | Specific Performance and Damages |
| Remedy Sought by Island Creek: | Termination |
| Amount of Money Involved: | Indeterminate |
| Number of Arbitrators Desired: | Three, who shall be attorneys experienced in commercial transactions |
| Place of Hearing: | Cleveland, Ohio |

The foregoing contract, Article VI, Section 12, provides as follows:

'Except as to any matter expressly stated herein to be within the sole judgment of one of the parties hereto, any dispute, controversy or claim arising out of or relating to. this Agreement shall be determined by arbitration in accordance with the rules then obtaining of the American Arbitration Association; provided that neither party shall initiate arbitration proceedings until the expiration of thirty (30) days after notice of such dispute, controversy or claim shall have been given to the other party. Judgment upon the award rendered, may be entered in any court, state or federal, having jurisdiction.'

The parties agree that all notices required by the aforementioned provision have been duly given.

We further agree that we will abide by and perform any decision rendered hereunder and that a judgment may be entered upon the award in any court, state or federal, having jurisdiction.

| | |
|---|---|
| INDIANA-KENTUCKY ELECTRIC CORPORATION | ISLAND CREEK COAL SALES COMPANY |
| New York, New York | ISLAND CREEK COAL COMPANY |
| | Cleveland, Ohio" |